UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

J.K. Harris & Company, LLC,

Plaintiff,

v.

Vicki J. Dye, a Minnesota resident, and ABC Company, a corporation, entity, or person,

Defendant.

Civil No. 01-2041 (RHK/JMM)
**MEMORANDUM OPINION AND ORDER**

---

Steven E. Rau and Shalanda D. Ballard, Flynn & Gaskins, L.L.P., Minneapolis, Minnesota, for Plaintiff.

Charles R. Shreffler, Shreffler Law Firm, P.A., Minneapolis, Minnesota, for Defendant Vicki Dye.

---

## Introduction

Defendant Vicki J. Dye was employed as a tax consultant by Plaintiff J.K. Harris & Company, LLC ("JKH") for eight months in 2001. On February 20, 2001, Dye entered into an agreement with JKH that contained both a "non-disclosure of confidential information" provision and a "covenant against solicitation." JKH terminated Dye on October 2, 2001. Thereafter, JKH learned that Dye has been sending letters to several of the clients she formerly served, informing them that she is no longer employed by JKH and that JKH is the subject of an IRS criminal investigation. Dye has allegedly also had



FILED NOV 16 2001
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD
DEPUTY CLERK

conversations with some of JKH's clients in which she has indicated that "someone will be getting in touch with you to assist you with your tax problems." JKH alleges that Dye is employed by an unknown competitor – Defendant ABC Company ("ABC Company") – and is soliciting JKH's clients on her new employer's behalf.

Before the Court is JKH's Motion for a Temporary Restraining Order. JKH seeks an order enjoining and restraining Dye and ABC Company from directly or indirectly (1) soliciting business from any JKH client, (2) accepting business from any JKH client whom either Dye or ABC solicited, and (3) contacting, writing to, calling upon, diverting, or taking away any of JKH's sources of referral, customers, or clients. JKH also asks the Court to direct Dye and ABC Company (1) to disclose every JKH client they have contacted, written to, called upon, diverted, solicited, and/or taken away from JKH since October 2, 2001, and (2) to produce all JKH customer lists they have in their possession or to which they have access. The following constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52(a). For the reasons set forth below, the Court will deny JKH's motion.

## Background

### I. The Parties

JKH is a Delaware corporation with its principal place of business in Charleston, South Carolina, and engages in helping taxpayers settle delinquent accounts with various taxing authorities. (Compl. ¶ 2.) On behalf of individuals and small businesses, JKH

negotiates requests for the abatement of penalties, submits offers in compromise, and generally helps clients resolve problems and come into compliance with the requirements of taxing authorities. (Linder Aff. ¶ 2.) JKH "enables delinquent taxpayers to pay for its services in installments and set up a finance company to provide loans to its clients to help them pay their delinquent tax bills." (Compl. ¶ 2.)

Dye is an individual who, it is alleged, resides in Minnesota. (Id. ¶ 3.) The Complaint asserts that ABC Company, Dye's unknown new employer, is a Minnesota corporation or legal entity that is engaged in the tax resolution business and is a competitor of JKH. (Id. ¶ 4.) Based on the foregoing, JKH asserts that the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) on the grounds that this is a civil action between citizens of different states in which the amount in controversy exceeds $75,000.[1] (Id. ¶ 5.)

## II. Factual Background

JKH hired Dye as a tax consultant on February 6, 2001. (Compl. ¶ 3; Linder Aff. ¶ 3.) After spending nearly two weeks in on-the-job training, JKH's Regional Manager, Phil Bowsher, gave Dye a "Confidentiality/ Non-Disclosure, Non-Solicitation and Non-Compete Agreement for Tax and Financial Consultants and Regional Mangers" (the

---

[1] Counsel for Dye represented to the Court at the hearing that "End Tax Problems" is the "doing business as" name for Dye's current employer, a Florida limited liability company. It further appears from the record that End Tax Problems has its principal place of business in Florida. Accordingly, there appears to be complete diversity between the parties.

"Agreement").[2] (Compl. ¶ 7; Dye Aff. ¶ 2.) On February 20, 2001, Dye signed the Agreement. (Dye Aff. ¶ 2.) The Agreement contains a paragraph entitled "Covenants Against Solicitation" that provides as follows:

> Employee acknowledges that the services he/she is to render are of a special and unusual character with a unique value to JKH, the loss of which cannot be adequately compensated by damages in an action at law. In view of the unique value to JKH of the services of Employee because of the Confidential Information to be obtained by, or disclosed to, Employee, as hereinbefore set forth, and in exchange for Employee's status being changed from independent contractor to employee, **Employee covenants and agrees that for a period of 12 months after he/she ceases to be employed by JKH, for any reason, he/she will not, either directly or indirectly, on behalf on himself or herself or any competitor of JKH, call upon, solicit, divert or take away, or attempt to solicit, divert or take away, any of JKH's sources of referral, customers or clients, including, without limitation, those customers or clients who have had contact with a JKH employee or with whom JKH has contracts**; or solicit for employment any of JKH's employees.

(Compl., Ex. A (emphasis added).) The Agreement also contained a "Non-disclosure of Confidential Information" provision that provides in full as follows:

> The success of JKH in the tax resolution and consulting business depends upon the relationship which it develops with its clients, sources of referrals, advertising media, employees, suppliers of office space, call centers, and the Internal Revenue Service. **JKH is able to compete effectively in the tax resolution and consulting business because JKH has developed and maintained a body of confidential and proprietary information. Employee acknowledges that in and as a result of his/her employment by JKH, he/she will be making use of, acquiring, and/or adding to confidential information of a special and unique nature and value relating**

[2] The Vice President of Human Resources for JKH, Mark Mohaghan, sent a "new hire packet" to the regional manager for Dye's region, Phil Bowsher on or about January 29, 2001. That packet included the Agreement. (Aff. of Mark Mohaghan ¶¶ 1-4.)

> **to such matters as JKH's** business models, business plans, marketing plans, training methods, product designs, trade secrets, suppliers, systems, procedures, programs, data bases, manuals, files, sources of referral, contracts with clients, confidential reports, and **lists of customers or clients, as well as the nature and type of services rendered by JKH, the forms, financing arrangements and processes used and preferred by JKH and JKH's customers and clients, the fees paid to JKH by its customers and clients,** the agreements which JKH has with advertising media and suppliers of executive suites and other office space, the agreements that JKH has with its calling centers and the way in which such calling centers are utilized by JKH, and the agreements and compensation plans that JKH has with its employees (all of which are deemed for all purposes confidential and proprietary and which are collectively referred to as "Confidential Information"). In exchange for Employee's status being changed from independent contractor to employee, **Employee covenants and agrees that he/she shall not, at any time during or following the term of his/her employment, divulge or disclose for any purpose whatsoever any Confidential Information that has been obtained by, or disclosed to, him/her as a result of his/her employment by JKH**.

(Compl., Ex. A (emphasis added).)

JKH terminated Dye on October 2, 2001. After the termination, Monica Linder, manager of JKH's Problem Resolution Division, learned of eleven letters sent by Dye to JKH clients with whom she had worked. (Linder Aff. ¶¶ 1, 5.) The letters appear to be a form letter and read as follows:

> Dear Client:
>
> I am writing this letter to inform each of you that JK Harris has terminated me from their employment on October 2nd. Because you have signed a contract with JK Harris you are a customer with them and not myself. Therefore I am forced to step down from being involved with your case.
>
> There has been some information that has recently come to my attention from two former clients that I feel need your attention. I was not made aware of this

> information until after I was terminated, but felt I needed to inform you since I worked with you. JK Harris is under an IRS criminal investigation. This information has been made available on the Internet, and I have personally talked with the criminal investigator Kelly Jackson, so this information I am giving you is a fact. What does this mean? I cannot answer that question because I do not know what the outcome will be, and Ms. Jackson would not divulge any information to me only to clarify that it is a fact. As a customer of JK Harris it will be up to you to decide how this is going to affect any decisions you have made concerning your tax liability.

(Linder Aff. Ex. C.) Linder has received approximately ten telephone calls and at least one e-mail from JKH clients regarding the correspondence Dye has sent them. (Id. ¶ 6.) Linder avers that, during some of these telephone conversations, customers have told her that Dye told them "someone else will be getting in touch with [you] to assist [you] with [your] tax problems." (Id.) Dye denies telling any of her former JKH clients that someone else would be getting in touch with them. (Dye Aff. ¶ 9.)

On October 16, 2001, JKH sent Dye a letter informing her that JKH considered her actions to be a serious breach of her "Confidentiality Statement," to be libelous and slanderous, and to be a violation of the "Covenant against Solicitation" in the Agreement. (Linder Aff. Ex. D.) JKH demanded that Dye cease any further communications with JKH clients and stated that, should any JKH client contact her, she should advise them that she is no longer with the company. (Id.) JKH indicated that it would be acceptable for Dye to provide any former client with the appropriate contact information for JKH. (Id.) After sending the letter to Dye, JKH has learned of at least one letter that Dye sent to a former client on or about October 23, 2001. (Linder Aff. Ex. C.)

On October 25, 2001, Dye became an employee of End Tax Problems, a company having its headquarters in Orlando, Florida. (Dye Aff. ¶ 10.) Dye contends that she has not initiated any telephone contact with any of the clients to whom she has sent the letter. (Id. ¶ 9.) If contacted by a former client who asks what they should do, Dye has encouraged them to contact the IRS to check on the status of their case. (Id.) Where a few of her former clients have asked Dye to recommend another company, she has referred those clients to the website of her employer, End Tax Problems, Inc. (Id. ¶ 10.) Seven persons who were clients to JKH are now clients of End Tax Problems. (Id.)

JKH argues that Dye's actions demonstrate that she is (a) contacting its clients in an attempt to divert, solicit and/or take away those clients, and that (b) Dye has disclosed confidential client information to a third party -- namely, her current employer -- who will be "getting in touch" with JKH's clients. JKH has asserted a breach of contract claim against Dye and claims of tortious interference with prospective business advantage and misappropriation of trade secrets against Dye and ABC Company.

**Analysis**

Whether a temporary restraining order should issue depends upon an evaluation of the following factors. (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunctive relief will inflict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. See Dataphase Sys., Inc. v. C.L. Sys., Inc., 640 F.2d 109, 113 (8th

Cir. 1981). "When applying the Dataphase factors, as they have come to be called, a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene." Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc., 182 F.3d 598, 601 (8th Cir. 1999) (internal quotation marks and citations omitted). The party requesting the restraining order bears the "complete burden" of proving all the factors listed above. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).

**1. Irreparable Harm**

"'The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.' Thus, to warrant . . . preliminary [injunctive relief], the moving party must demonstrate a sufficient threat of irreparable harm." Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999) (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506-07 (1959)); Glenwood Bridge, Inc. v. City of Minneapolis, 940 F.2d 367, 371 (8th Cir. 1991); see also In re Travel Agency Commission Antitrust Litig., 898 F. Supp. 685, 689 (D. Minn. 1995) ("[A]n injunction cannot issue based on imagined consequences of an alleged wrong. Instead, there must be a showing of imminent irreparable injury."). Based upon the record before it, the Court concludes that JKH has failed to demonstrate such a threat of irreparable harm.

JKH contends that Dye has sent letters regarding the IRS's criminal investigation

to her former clients in order to solicit and divert those customers away from JKH.[3] The record supporting this argument, however, is not compelling. Although Linder avers that a few customers have told her that Dye had said that "someone else would be getting in touch with them to assist them with their tax problems" (Linder Aff. ¶ 6), that evidence is inadmissible hearsay. See Fed. R. Evid. 801(c). Even if the customers' statements to Linder were not hearsay, a comment that someone else would be "getting in touch" with them hardly compels an inference that Dye is trying to steal away those clients. Such a statement from Dye can also reasonably be understood as an indication that another employee of JKH would be "getting in touch" with them as a result of Dye's departure. Indeed, the form letter JKH has submitted to the Court reminds her former client that their contractual relationship is with JKH, not with her. To the extent some JKH's clients have asked Dye to recommend another company, the number appears to be very small.

JKH also complains that Dye's letters are harming JKH's goodwill and business reputation. The Court observes, however, that JKH itself, through Linder's affidavit, has acknowledged that the IRS investigation of JKH has been "a topic of several newspaper articles." (Linder Aff. ¶ 6.) JKH has made no argument and presented no evidence

---

[3] Counsel for JKH asserted at the hearing that the customer list Dye has as a result of her employment by JKH contains 256 names. JKH has not provided competent evidence, by way of affidavit or otherwise, that would establish the number of customers to whom Dye has potentially sent letters. The Court does not consider counsel's representations to be evidence and can make no finding regarding the number of letters Dye may have sent.

suggesting that the statements in Dye's letters about the IRS investigation are untrue. Finally, JKH has not established that it would be impossible to calculate any loss in revenues that it might suffer from Dye's conduct, such that JKH lacks an adequate remedy at law. The Court concludes that JKH has failed to establish a threat of imminent irreparable harm in the absence of a temporary restraining order.[4]

**2. Likelihood of success on the merits**

JKH has asserted three claims against Dye: breach of the Agreement, tortious interference with prospective business relationships, and violation of South Carolina's Trade Secrets Act. JKH has cited **no** case law or statutory provisions to substantiate its assertion that it is likely to succeed on the merits of any of these claims. Starting from nothing, the Court assesses JKH's likelihood of success on each claim in turn.

**a. Breach of Contract**

The parties evidently agreed that South Carolina law would govern the

---

[4] At the hearing, counsel for JKH argued for the first time that Plaintiff could be irreparably harmed by Dye's conduct because that conduct might subject JKH to a Federal Trade Commission enforcement action under the Gramm-Leach-Bliley Financial Modernization Act ("the Gramm-Leach-Bliley Act"). The Gramm-Leach-Bliley Act was enacted by Congress on November 12, 1999. Pub. L. No. 106-102, 1999 U.S.C.C.A.N. (113 Stat.) 1338. JKH did not reference the Gramm-Leach-Bliley Act in its memorandum in support of the TRO motion, let alone identify the relevant provision or provisions of the Act on which it purports to rely. The Court declines to evaluate whether and to what extent the Gramm-Leach-Bliley Act may apply to JKH and its activities.

Agreement.[5] (Agreement ¶ 8.) JKH has invoked this choice of law provision in its Complaint. Applying South Carolina law to the Agreement, there appears to be a serious problem with JKH's ability to enforce the covenants against Dye.[6] "It is well settled that a restrictive covenant . . . ancillary to a contract of employment, will be upheld and enforced **if**, inter alia, **it is supported by a valuable consideration**." Standard Register Co. v. Kerrigan, 119 S.E.2d 533, 542 (S.C. 1961) (emphasis added). Earlier this year, the South Carolina Supreme Court specifically addressed "whether continued at-will employment is sufficient consideration to enforce a covenant **entered into days**, months, or even years **after the initial employment offer**." Poole v. Incentives Unlimited, Inc., 548 S.E.2d 207, 209 (S.C. 2001) (emphasis added). After reviewing its own prior decisions and cases from other jurisdictions, the South Carolina Supreme Court held that

---

[5] After three requests by the Court for a **complete** copy of the Agreement Dye signed, the Court finally received such a copy after business hours on Wednesday, November 14. Together with the Agreement, counsel for JKH also sent to the Court a three-page document entitled "Employee Compliance and Acknowledgment Disclosure." That document consists of three sections: (1) a Telephone Monitoring Agreement; (2) a Confidentiality Requirement and Agreement; and (3) a Receipt of Employee Handbook acknowledgment. While Dye signed the first and third sections of the form, neither she nor a representative of JKH signed the section captioned "Confidentiality Requirement and Agreement."

[6] At the hearing, counsel for JKH argued that there was a "legion" of cases in the Eighth Circuit holding that restrictive covenants executed under the circumstances presented in this case are supported by adequate consideration and, hence, valid and enforceable. This position is contrary to JKH's invocation in its Complaint of the choice of law provision in the Agreement, which designates South Carolina law as the law governing the Agreement.

"when a covenant is entered into after the inception of employment, separate consideration, in addition to continued at-will employment, is necessary in order for the covenant to be enforceable." Id. Such separate consideration may include a change in the employee's position, duties, or salary. Id.

Dye was hired on February 6, 2001; two weeks later, she entered into the restrictive covenants that JKH seeks to enforce. JKH asserts that Dye signed the Agreement "as a condition of her employment." (Linder Aff. ¶ 3.) The record before the Court, however, shows that Dye was not presented with the Agreement at the time she completed the rest of her paperwork as a new employee.

Looking to the Agreement itself, it recites that, in consideration for Dye's covenants, JKH has changed her status from that of "independent contractor" to that of employee. There is no evidence before the Court, however, establishing that Dye was initially hired as an "independent contractor" or anything other than an employee on February 6. Indeed, the Affidavit of Mark Monaghan demonstrates that Dye was hired as an employee from the very first. JKH has identified no separate consideration given in exchange for Dye's covenants. The Court therefore concludes that there is little likelihood of success on the breach of contract claim.

**b. South Carolina Trade Secrets Act**

JKH alleges that Dye is using and disclosing (or threatening to use and disclose) confidential information about JKH's clients in competition with JKH. (See Compl. ¶¶

33, 36.) JKH claims that this conduct violates the South Carolina Trade Secrets Act and constitutes a misappropriation of trade secrets.[7] Section 39-8-30(B) of the South Carolina Code provides that

> [e]very employee who is informed of or should reasonably have known from the circumstances of the existence of any employer's trade secret has a duty to refrain from using or disclosing the trade secret without the employer's permission independently of and in addition to any written contract of employment, secrecy agreement, noncompete agreement, nondisclosure agreement, or other agreement between the employer and the employee.

It is not clear whether this provision applies to **former** employees. The above-quoted provision stands in contrast to the Restatement (Third) of Unfair Competition,

---

[7] "Misappropriation" is defined to include

> the disclosure or use of a trade secret of another without express or implied consent by a person who
>
> (i) used improper means to acquire knowledge of the trade secret; or
> (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was
>
> > (A) derived from or through a person who had utilized improper means to acquire it;
> > (B) acquired it my mistake or under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
> > (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

S.C. Code Ann. 39-8-20(2)(c).

which expressly includes "[a]n employee or former employee" within the scope of its prohibition against disclosing trade secrets. See Restatement (Third) of Unfair Competition § 42 (1995) (emphasis added). Dye engaged in the complained-of conduct after her termination. Therefore, it is not clear that her conduct would violate section 39-8-30. Furthermore, there is a lack of evidence tending to establish that Dye is using the confidential client information "in competition with JKH," as JKH alleges. The Court concludes that there is little likelihood of success on the merits of the misappropriation of trade secrets claim based on the record before it.

### c. Tortious Interference with Prospective Business Relationships

While it appears that South Carolina law governs disputes arising out of the Agreement, JKH has not indicated whether its tortious interference claim is governed by South Carolina or Minnesota law. In 1990, South Carolina recognized a cause of action for tortious interference of prospective business relationships and held that, to recover on such a cause of action, "the plaintiff must prove: (1) the defendant intentionally interfered with the plaintiff's potential contractual relations; (2) for an improper purpose or by improper methods; (3) causing injury to the plaintiff." Crandall Corp. v. Navistar Int'l Transp. Corp., 395 S.E.2d 179, 180 (S.C. 1990). Under Minnesota law, a cause of action for tortious interference with a prospective business relationship lies when one intentionally and improperly (1) induces a third person not to enter into or to continue the prospective relation, or (2) prevents the plaintiff from acquiring or continuing the

prospective relationship.[8] See United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628, 632-33 (Minn. 1982); Hough Transit, Ltd. v. National Farmers Org., 472 N.W.2d 358, 361 (Minn. Ct. App. 1991). JKH has not provided any choice of law analysis for the Court. It appears, however, that the law of South Carolina and Minnesota for a tortious interference claim is substantially the same, and that under either jurisdiction's law, JKH does not appear to have a strong claim.

JKH has not identified any prospective customers who have declined to retain JKH for tax resolution services -- or are likely to do so -- as a result of Dye's conduct. As for ongoing contractual relationships with existing customers, the only evidence of lost business is Dye's averment that seven customers have ceased their contractual relationship with JKH. There is no evidence, however, to establish that these seven

---

[8] To determine whether the defendant's conduct is improper, the Court must examine several factors:

> (a) the nature of the actor's conduct,
> (b) the actor's motive,
> (c) the interests of the other with which the actor's conduct interferes,
> (d) the interests sought to be advanced by the actor,
> (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
> (f) the proximity or remoteness of the actor's conduct to the interference, and
> (g) the relations between the parties.

R.A., Inc. v. Anheuser-Busch, Inc., 556 N.W.2d 567, 571 (Minn. Ct. App. 1996) (quoting Restatement (Second) of Torts § 766B cmt. a). Significantly, Dye has averred that she sent the form letter concerning the IRS investigation to her former clients in order to avoid potential civil liability; Dye understands that another former JKH tax consultant has been sued for fraud. (Dye Aff. ¶ 7.)

clients changed firms as a result of Dye's conduct. Otherwise, "the mere general loss of possible unspecified customers does not establish the tort of intentional interference with prospective economic relations under Minnesota law." International Travel Arrangers v. NWA, Inc., 991 F.2d 1389, 1405 (8th Cir.), cert. denied, 510 U.S. 932 (1993). Therefore, the Court concludes there is little likelihood of success on this claim.

**3. Balance of Harms and Public Interest**

In light of the absence of a threat of imminent irreparable harm, an order restricting Dye's conduct and affirmatively compelling Dye to provide certain information is onerous and places a significant burden on her. Preliminary injunctive relief is an extraordinary remedy that should not be granted as a matter of routine. See Sanborn Mfg. Co. v. Campbell Hausfeld/ Scott Fetzer Co., 997 F.2d 484, 486 (8th Cir. 1993); Intel Corp. v. ULSI Sys. Tech., Inc., 995 F.2d 1566, 1568 (Fed. Cir. 1993), cert. denied, 510 U.S. 1092 (1994). Thus, the balance of harms does not favor granting the motion. As for the public interest, in light of the unenforceability of the restrictive covenants, there appears to be little public interest in the issuance of an temporary injunction to enforce those covenants.

**Conclusion**

The balance of the equities does not favor JKH such that justice requires the Court to intervene with temporary injunctive relief. Based on the foregoing, and all of the files, records and proceedings herein, **IT IS ORDERED** that Plaintiff J.K. Harris &

Company's Motion for a Temporary Restraining Order (Doc. No. 2) is **DENIED**.

Dated: November 16, 2001

RICHARD H. KYLE
United States District Judge